**SPONSORSHIP AGREEMENT**

This Sponsorship Agreement is made and entered into as of November 30,, 2021 (the "**Effective Date**") between Equity Prime Mortgage, LLC, its affiliates and subsidiaries (the "**Company**") and Jesse Iwuji Motorsports, LLC ("**JIM**"), each being referred to individually as a "**Party**," and collectively as the "**Parties**." This Sponsorship Agreement, together with the Statement of Work ("**SOW**") attached hereto, shall be collectively referred to as the "**Agreement**."

   **WHEREAS**, the Parties wish to memorialize and formalize their arrangement with respect to the services, duties, and obligations to be provided and/or performed by either Party in accordance with Company's sponsorship of JIM as the "Official Mortgage Provider and Founding Partner of Jesse Iwuji Motorsports."

   **NOW, THEREFORE**, in consideration of the mutual covenants and promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged, the Parties hereby as follows:

**TERMS AND CONDITIONS**

1. **Services.** During the Term (as defined herein), JIM shall perform for the Company (or its designee) the services detailed in the SOW (the "**Services**"). Should Company require or request that JIM perform additional services in addition to the Services set forth in the SOW, the Parties agree that Company and JIM shall negotiate in good faith with respect to the terms, conditions, and compensation for such additional services. Any agreement for additional services not initially contemplated via this Agreement shall be set forth in writing, signed by the Parties, and considered an addendum to this Agreement.

2. **Compensation.** In exchange for JIM's performance of Services, Company agrees to compensate JIM in accordance with the payment terms set forth in the SOW ("**Compensation**").

3. **Confidentiality.** The Parties agree that this Agreement, and all terms, conditions, and provisions contained herein, shall constitute confidential and proprietary information of each Party. As such, the Parties shall not (nor shall it permit or cause its employees, agents or representatives to) disclose the financial and/or other material terms of this Agreement, or any other confidential materials or information disclosed to or by either Party to any third party, except as set forth herein. The Parties agree to keep the terms of this Agreement confidential and not disclose any term of this Agreement to any individual or entity without the express written consent of the other Party; provided, however, that the Parties may disclose information relating to this Agreement: (i) to the Party's legal or financial advisors who have agreed to maintain the confidentiality of this Agreement; (ii) in order to comply with legal requirements, but only to the extent necessary to comply with such requirements, provided that the Party required to make such disclosure first seeks or assists the other Party in seeking a protective order or other appropriate relief in order to limit or prevent the disclosure of such confidential information; or (iii) to enforce the terms of this Agreement.

4. **Press Releases**. Neither Party will issue or make, directly or indirectly, any press releases or other public announcements relating to the Agreement or the underlying transaction(s) between Company and JIM without the prior written approval of the other Party. Each Party reserves the right to withhold approval in its sole discretion. It is mutually agreed upon between the Parties that the Parties will issue a press release prior to the eight Primary Races (as defined in the SOW). Company shall provide JIM with all information, statements, and/or other material that Company wishes to include in the press release at least seventy-two (72) hours in advance of release. Company acknowledges that Company's failure to provide JIM such information may result in such information not being included in the press release and/or JIM issuing a press release containing information, statements, and/or other material as JIM deems fit in JIM's sole discretion.

5. **Intellectual Property Ownership.**

   a. **Company Trademarks**: During the Term, Company grants JIM a limited, revocable, non-exclusive, non-assignable, non-transferable, non-sublicensable, royalty-free license to use Company's trademark, logo, service mark, and/or trade name (collectively, "**Company Trademarks**"), only to the extent essential and necessary to provide the Services. Upon Company's written request, JIM agrees to promptly remove or replace any Company Trademark, but in no event later than three (3) days after receipt of any such request. Upon termination or expiration of the Agreement, all further use of any Company Trademark shall immediately cease. Each use, display (including the size, place, and manner),

and/or reproduction of the Company Trademarks by JIM must be pre-approved by Company in writing in advance and be in accordance with the Agreement; provided, Company's failure to provide approval within three (3) business days of JIM's request therefor shall constitute deemed approval. JIM's use of the Company Trademarks does not confer or imply any ownership, goodwill, or other rights in the Company Trademarks. JIM recognizes the unique value, goodwill, and secondary meaning associated with the Company Trademarks. JIM acknowledges that all rights, title, and interests in the Company Trademarks and the goodwill pertaining thereto automatically vests in Company, and at all times will remain owned by and in the name of Company. JIM shall not contest the validity of Company's and/or its affiliates' ownership of any Company Trademark.

b. **JIM Trademarks; Talent Likeness:** JIM grants Company a limited, revocable, non-exclusive, non-assignable, non-transferable, non-sublicensable, royalty-free license to use: (i) JIM's trademark(s), logo(s), service mark(s), and/or trade name(s) (collectively, "**JIM Trademarks**") and (ii) Talent Likeness (as defined in the SOW) during the Term, only to the extent essential and necessary for purposes of the Agreement. Upon JIM's written request, Company agrees to promptly remove or replace any JIM Trademark or Talent Likeness, but in no event later than three (3) days after receipt of any such request. Upon termination or expiration of the Agreement, all further use of any JIM Trademark or Talent Likeness shall immediately cease. Company's use of the JIM Trademarks or Talent Likeness does not confer or imply any ownership, goodwill, or other rights in the JIM Trademarks or Talent Likeness. Company recognizes the unique value, goodwill, and secondary meaning associated with the JIM Trademarks and Talent Likeness. Company acknowledges that all rights, title, and interests in the JIM Trademarks and Talent Likeness and the goodwill pertaining thereto automatically vests in JIM and/or Talent, and at all times will remain owned by and in the name of JIM and/or Talent. Company shall not contest the validity of JIM's and/or its affiliates' ownership of any JIM Trademark.

6. **Representations and Warranties.** Each Party represents and warrants that (i) it is a validly existing business entity and has all rights, licenses, permits, qualifications and consents necessary to perform its respective obligations pursuant to the Agreement, and will comply with all laws, including as relates to the Services; (ii) neither the Services nor any Party property, including the Company Trademarks, JIM Trademarks, Talent Likeness, nor any combination thereof, (a) infringes or misappropriates any intellectual property right of any third party, and/or (b) breaches and/or violates the privacy and/or any other right of any third party, (iii) the Services will be performed in a professional and workmanlike manner in accordance with standards generally accepted in each Party's industry, and (iv) the Services will conform with the Agreement and the SOW.

7. **Term and Termination.**

    a. **Term:** The Term of the Agreement will begin on the Effective Date and will continue for a period of two (2) years thereafter ("**Term**"), unless sooner terminated in accordance with the terms set forth in this Agreement.

    b. **Termination:** Either Party may terminate the Agreement upon written notice to the other Party if such Party is in breach of any material provision of the Agreement and such breach is not cured within thirty (30) days after written notice thereof is received by the Party.

    c. **Effect of Termination:** Upon expiration or termination of the Agreement, all rights, duties, and obligations of the Parties shall automatically cease as of the date of expiration or termination; provided, in the event of termination pursuant to Company's material breach of this Agreement, Company acknowledges that it shall remain responsible for paying JIM the entirety of the compensation set forth in the SOW.

8. **Force Majeure.** If by reason of natural catastrophe, public emergency, labor dispute, lockout or strike, pandemic, act of God or public enemy, cancellation of race event, war, municipal ordinance, state or federal law, governmental order or regulation, disability, illness, injury, crashes resulting in material damage that prevents JIM's ability to participate in an event, or any other cause beyond JIM's reasonable control (each, a "**Force Majeure Event**"), it is mutually understood between the Parties that JIM's failure to act or perform as required under this Agreement due to

a Force Majeure Event shall not be deemed a material breach of this Agreement. The Parties agree that in upon the occurrence of a Force Majeure Event, JIM's duties and obligations shall be suspended hereunder until such time as the Force Majeure Event is no longer in effect.

9. **Independent Contractor Relationship.** JIM is performing the Services as an independent contractor to the Company. Nothing in the Agreement shall in any way be construed to constitute either Party as an agent, employee or representative of the other Party. Without limiting the generality of the foregoing, neither Party shall be authorized to bind the other Party to any liability or obligation without the other Party's prior written consent.

10. **Indemnification.** Company agrees to indemnify, defend and hold harmless JIM and its affiliates and its and their shareholders, owners, directors, officers, employees, contractors, agents, representatives, successors and assigns (collectively, "**JIM Indemnitees**"), from and against all actual losses, damages, liabilities, demands, claims, judgments, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) Company's violation of any intellectual property rights of a third party, (ii) any breach of this Agreement, and/or (iii) any negligent, reckless or intentionally wrongful act or omission (each, a "**JIM Claim**"). JIM will (at Company's sole expense) reasonably cooperate to facilitate the settlement or defense of any JIM Claim. Company is solely responsible for defending any JIM Claim against a JIM Indemnitee (y) subject to such JIM Indemnitee's right to participate with counsel of its own choosing at its own expense, and (z) subject to JIM's right at any time to take over such defense, in which case, in addition to all its other obligations pursuant to this Section, Company remains responsible and liable to JIM for all costs and expenses relating to the defense of such JIM Claim, which costs and expenses shall be paid by Company to JIM ten (10) days after date of invoice from JIM. Company will not agree to any settlement that imposes any obligation or liability on a JIM Indemnitee without such JIM Indemnitee's prior express written consent.

JIM agrees to indemnify, defend and hold harmless Company and its affiliates and its and their shareholders, owners, directors, officers, employees, contractors, agents, representatives, successors and assigns (collectively, "**Company Indemnitees**"), from and against all actual losses, damages, liabilities, demands, claims, judgments, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) the negligent or wrongful performance of the Services, (ii) any breach of the Agreement, and/or (iii) any negligent, reckless or intentionally wrongful act or omission (collectively, "**Company Claim**"). Company will (at JIM's sole expense) reasonably cooperate to facilitate the settlement or defense of any Company Claim. JIM is solely responsible for defending any Company Claim against a Company Indemnitee (y) subject to such Company Indemnitee's right to participate with counsel of its own choosing at its own expense, and (z) subject to Company's right at any time to take over such defense, in which case, in addition to all its other obligations pursuant to this Section, JIM remains responsible and liable to Company for all costs and expenses relating to the defense of such Claim, which costs and expenses shall be paid by JIM to Company ten (10) days after date of invoice from Company. JIM will not agree to any settlement that imposes any obligation or liability on a Company Indemnitee without such Company Indemnitee's prior express written consent.

11. **Limitation of Liability.** In no event shall either Company or JIM be liable to the other or to any other party for any indirect, incidental, special or consequential damages, or damages, including lost profits or loss of business, however caused and under any theory of liability, whether based in contract, tort (including negligence) or other theory of liability, regardless of whether Company or JIM was advised of the possibility of such damages. Without limiting the previous sentence, and except for JIM's and Company's indemnification obligations contained in section 10, in no event shall either Party's liability arising out of or in connection with this Agreement exceed the amounts paid by Company to JIM under this Agreement for the Services giving rise to such liability.

12. **Miscellaneous.**

    a. **Governing Law; Consent to Personal Jurisdiction:** The Agreement shall be governed by the laws of the State of Florida, without regard to the conflicts/choice of law provisions of any jurisdiction. (For this type of agreement an ADR provision requiring mediation and binding arbitration for monetary claims (not equitable claims), may make sense- see example below)Each Party agrees that any dispute that arises out of or relates to this Agreement shall brought in the state or federal courts located in Broward County, Florida, hereby expressly submits to the exclusive personal jurisdiction and venues

of such courts, and hereby expressly waives any claim of objection or defenses thereto. If any legal action or proceeding is brought for the enforcement of this Agreement, the prevailing party shall be entitled to recover reasonably incurred attorney's fees and costs.

**EXAMPLE-** Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be first subject to attempted resolution by mediation. If the parties cannot resolve the matter through mediation within sixty (60) days of the notice of claim; then it will be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial [or other] Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

b. **Non-Restrictive Relationship:** Nothing in the Agreement will be construed as preventing Company or JIM or Talent from independently developing or providing services which may be the same or similar to the Services, so long as the terms and conditions of this Agreement remain in full force and effect.

c. **Entire Agreement:** This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties relating to the subject matter herein. This Agreement may not be transferred or assigned by either Party without the prior written consent of the other Party. This Agreement and any amendment hereto may be executed in several counterparts, each of which shall be deemed an original copy, and all of which together shall constitute one and the same instrument. Facsimile and other electronically transmitted signatures shall be binding upon receipt.

d. **Headings:** Headings are used in this Agreement for reference only and shall not be considered when interpreting the Agreement.

e. **Severability:** If a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be invalid or unenforceable, the remainder of this Agreement will continue in full force and effect, and such provision will (a) be enforced to the maximum extent permissible so as to carry out the intent of the Parties, and (b) will be replaced by a valid and enforceable provision that has a similar effect.

f. **Modification, Waiver:** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties. Waiver of a breach of any provision of the Agreement will not operate as a waiver of any other or subsequent breach.

g. **Notices:** Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by email, when delivered or emailed, (ii) if delivered by a nationally recognized overnight courier service, one (1) business day after acceptance for overnight delivery by said courier, or (iii) if mailed by U.S. registered or certified mail, return receipt requested, when signed, or when the giving of signature is refused.

h. **Joint Drafting:** Each Party acknowledges that they have participated in the drafting and negotiation of this Agreement and have been afforded the opportunity to have legal counsel review this Agreement. As a result, there shall be no presumption against either Party on the ground that such Party was solely responsible for preparing this Agreement.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be signed as of the Effective Date.

| Equity Prime Mortgage, LLC | Jesse Iwuji Motorsports, LLC |
|---|---|
| By: _Eddy Perez_____ | By: _Matt Casto_____ |
| Name:_____ | Name:_____ |

DocuSign Envelope ID: 8A017E73-7F43-4DB7-9F63-B4CDE02ADC08

## STATEMENT OF WORK ("SOW")

This SOW is subject to the terms and conditions of the Sponsorship Agreement dated November 16, 2021 by and between Equity Prime Mortgage, LLC, its affiliates and subsidiaries (the "**Company**" or "**Equity Prime Mortgage**") and Jesse Iwuji Motorsports, LLC ("**JIM**"). This SOW sets forth the specific services to be provided (together, the "**Services**"), and work product to be delivered by JIM (together, the "**Deliverables**") with regard to the project described herein (the **"Project"**), as well as the deliverables and deadlines for both JIM and Company, and any additional terms governing the relationship. Any defined terms in this SOW that are not defined herein shall have the meaning ascribed to them in the Sponsorship Agreement.

**Project Description:**

Race Sponsorship & Talent Likeness

**Costs:**

Total Cost of Sponsorship: Six Million Dollars (USD $6,000,000.00)

**Compensation Terms:**

**Year One of the Term (2022 Season):** Equity Prime Mortgage shall pay JIM Two Million, Two Hundred and Fifty Thousand Dollars (USD $2,250,000.00), to be paid monthly starting December 1, 2021 at the monthly payment amount of One Hundred Eighty Seven Thousand, Five Hundred Dollars (USD $187,500.00/month). Monthly payment shall be paid on the first day of each month.

**Year Two of the Term (2023 Season):** Equity Prime Mortgage shall pay JIM Three Million, Seven Hundred and Fifty Thousand Dollars (USD $3,750,000.00), to be paid monthly starting December 1, 2022 at the monthly payment amount of Three Hundred and Twelve Thousand, Five Hundred Dollars (USD $312,500.00/month). Monthly payment shall be paid on the first day of each month.

**Talent Likeness**

"**Talent Likeness**" means the name, image, likeness, and/or other publicity rights of: (1) Jesse Iwuji, and (2) Emmitt Smith. All use of Talent Likeness shall be subject to JIM's prior review and written approval, which may be withheld in JIM's sole discretion. JIM may provide Equity Prime Mortgage with images containing pre-approved uses of Talent Likeness ("**Approved Images**"). Equity Prime Mortgage acknowledges that it shall not make any modifications to the Approved Images without JIM's prior written approval, which may be withheld in JIM's sole discretion. Use of Talent's Likeness within social media i.e. Facebook, Instagram, YouTube must be removed upon request after expiration or termination of the Term.

**Race Sponsorship Deliverables:** During the Term, JIM shall ensure the performance of the following Services and/or Deliverables:

**On-Track Team Commitments:**

- Eight (8) Primary Races ("**Primary Races**") per season to prominently featuring Equity Prime Mortgage Logo and Colors during the 2022 and 2023 seasons – Hood and Upper Quarter panels. The Primary Races for the 2022 season are the following:

    o Alsco 300 Las Vegas – March 5, 2022
    o Echo Park 250 Atlanta – March 19, 2022
    o Alsco 300 North Carolina – May 28, 2022
    o Credit Karma 250 Atlanta – July 9, 2022

- o Ambetter 200 New Hampshire – July 16, 2022
- o Pocono 225 Penn – July 23, 2022
- o Penzoil 150 Indiana – July 30, 2022
- o Sparks 300 Alabama – October 1, 2022

The Primary Races shall be the same for the 2023 Season. The Parties reserve the right to modify the Primary Races upon mutual agreement.

- Primary logo on Race Suit and co-branded hat for Primary Races.

Press releases for each Primary Race will include reference to Equity Prime Mortgage. The content of the release will be mutually agreed to by the Parties

- Logo inclusion of Equity Prime Mortgage in associate partner locations of car and race suit for twenty-four (24) races (to be mutually determined by the Parties).

- Professionally recorded content capture of race weekend activity featuring Equity Prime Mortgage that will wrap with a season recap video specifically around Equity Prime Mortgage.

- JIM shall provide Emmitt Smith 1x per year minimum for Equity Prime Mortgage suite appearance/photos/interaction on race day for a day of celebration with Equity Prime Mortgage's most important guests followed by joining Equity Prime Mortgage's team for dinner. The date, time, and location of the foregoing appearance shall be mutually determined by the Parties.

- Ten (10) VIP pit passes for each Primary Race; provided, Equity Prime Mortgage shall inform JIM of the name for each guest at least seven (7) days prior to the date of the Primary Race. Failure to provide names of guests by such time may result in a waiver of VIP pit passes. Should JIM incur any additional expense in obtaining VIP pit passes, Equity Prime Mortgage shall immediately reimburse JIM for such expense(s).

- Four (4) VIP pit passes for twenty-four (24) associate race partnerships (to be mutually determined by the Parties); provided, Equity Prime Mortgage shall inform JIM of the name for each guest at least seven (7) days prior to the date of the Primary Race. Failure to provide names of guests by such time may result in a waiver of VIP pit passes. Should JIM incur any additional expense in obtaining VIP pit passes, Equity Prime Mortgage shall immediately reimburse JIM for such expense(s).

- Logo Placement on items such as the pit box, the semi-truck hauler, pit wall banner, for all races in 2022. Logo to be of equal size and comparable placement as other founding partner logos

- Equity Prime Mortgage Loan Officers get access to Jesse Iwuji Motorsports fan activations at tracks for eight (8) races (to be mutually determined by the Parties).
    - o Can include any print or digital material produced by Equity Prime Mortgage

- JIM shall use best efforts to make mention of its relationship with Equity Prime Mortgage during major media coverage with national and regional and local coverage each year; provided the failure to do so shall not be deemed a material breach of this Agreement.

**Off-Track Team Commitments:**

- Use of JIM Trademarks and Talent Likeness for Equity Prime Mortgage campaigns using Approved Images provided by JIM. All use of JIM Trademarks and/or Talent Likeness shall be subject to JIM's prior written approval.

- Designations for Equity Prime Mortgage:
    - "Official Mortgage Provider of Jesse Iwuji Motorsports"
    - "Official Founding Partner of Jesse Iwuji Motorsports"

- One (1) day of production each quarter with Jesse Iwuji (maximum six (6) hours) on a mutually agreeable day. The date, time, and location of the production day shall be mutually determined by the Parties
    - Jesse Iwuji Likeness to be used for commercial, print or digital advertising purposes. All use of Jesse Iwuji's Likeness shall be subject to JIM's prior written approval.
    - JIM will provide Emmitt Smith for 6hrs of production per year (2 hours off-track. 4 hours at track or at current location). The date, time, and location of the production day shall be mutually determined by the Parties.
    - Content direction desired and production day materials (i.e. scripts for review, etc.) shall be provided by Equity Prime Mortgage in advance and shall be mutually agreed upon in each instance by the Parties.

- eMotorsports Racing Simulator Community Activation and/or Show Car program ("**Activations**"). Permanent Logo placement on side of eMotorsports Racing Simulator Activation and/or Show Car hauler for 2022 and 2023. Schools, Community Centers, Military Bases, etc. Select sites that JIM plans to stop will be calendared and open for Equity Prime Mortgage loan officers to attend. JIM to provide calendar at least sixty (60) days in advance and Equity Prime Mortgage to provide considerable notice of participation.

- Film content with Jesse and Emmitt in EPM logo polo for reveal Equity Prime Mortgage sponsored race car on November 18, 2021. The content will be pushed on Jesse, Emmitt, JIM and EPM channels at an agreed upon date after Thanksgiving 2021. Both JIM and EPM will have film crews on site. Content focus on Empowering People More and creating opportunity systems and why we started a race team and why EPM partnered with us.

- Ten (10) email blasts to database we will create through a QR Scan Code Waitlist System for fans who would like to participate with any of JIM's Activations.

- Two (2) Social media posts the week leading up to the race from JIM's and Jesse Iwuji's personal pages. One (1) JIM social media post-race thanking Equity Prime Mortgage for sponsoring team. Eight (8) social media posts from Emmitt Smith's social media promoting Primary Races during 2022 and 2023 – caption to be mutually agreed upon by the Parties and should be focused on Primary Race partnership of race team

- Unique opportunity using Notable Live software to engage fans for post-race engagement. Equity Prime Mortgage branding included. JIM may auction off race shoes, gloves, race visor, etc.… to raise money for charity. The date, time, and location of the charity shall be mutually determined by the Parties.

- Equity Prime Mortgage Logo on JIM website (jesseiwujimotorsports.com) and Jesse Iwuji's personal site (jesseiwuji.com)

- Jesse Iwuji to be available for Equity Prime Mortgage podcast once a quarter. The date, time, and location of the podcast taping shall be mutually determined by the Parties. Emmitt Smith available to join with Jesse for 2x podcast each year of agreement. Dates must be mutually agreed upon.

- Jesse Iwuji to be available for a sixty (60) min virtual team talk addressing the Equity Prime Mortgage team once per quarter. Dates must be mutually agreed upon.

- Post reveal press conference on Notable Live with Equity Prime Mortgage branding. Jesse, Emmitt to join EPM team to discuss opportunity to Empower People More and the race team's mission.

- Emmitt Smith & Jesse Iwuji to appear live at EPMX Jan 28th 2022 @ 4pm Est in Atlanta for 45-60 min session. Jesse and Emmitt to interact and engage with those attendees. Photos may be requested with certain guests.

IN WITNESS WHEREOF, each of the Parties hereto has caused this SOW to be signed as of the Effective Date.

**Equity Prime Mortgage, LLC**

By: _____
Name: Eddy Perez

**Jesse Iwuji Motorsports, LLC**

By: _____
Name: Matt Casto